## Orne *versus* Kittanning Coal Co.

Neither the vendee, the holder of the equitable title to land, out of possession, nor his assignee, can enforce specific performance of his contract, without payment or a previous tender of the purchase money due; if, however, the equitable owner, by the terms of his contract, is entitled to, or by contract is once fairly put into the possession under his title, and by some fraud or other illegal means is ousted therefrom, this rule does not apply; nor can specific performance of the contract be enforced, if the vendee has been guilty of a fraud on his vendor, in obtaining it. This fraud may be pleaded by the vendor, or by his representatives, or by his privies in estate.

May 25th, 1886. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

IT had been argued before the court, PAXSON, J., absent, May 26th, 1885: On October 5th, 1885. A re-argument was ordered. The attention of counsel was especially invited to the consideration of the question whether the defendants can avail themselves of the alleged fraud of Heylman upon Pomeroy to defeat the plaintiff's recovery.

ERROR to the Court of Common Pleas of *Blair county:* Of January Term 1884, No. 35.

This was an action of ejectment brought by Benjamin Orne against the Kittanning Coal Company for the undivided half of two certain tracts of land lying partly in Blair county and partly in Cambria county, containing about eight hundred acres. The part of the tract lying in Cambria county was not included in the writ. Plea, not guilty.

Before trial the death of Benjamin Orne was suggested, and John F. Orne et al. the heirs and devisees of the said Benjamin Orne were substituted.

The following are the facts as they appeared on the trial before ORVIS, J.

There were three titles disclosed in these tracts:

One called the Jackson title, held by the defendants, being but a mere possession of Thomas Jackson, originating within twenty-one years of the present suit.

Another called the Proctor title, being the title of the heirs, of Colonel Thomas Proctor, and their vendees, under application for survey, warrant, survey thereunder and return thereof; and payment by him of the purchase money to the Commonwealth before 1789. Of this title both the plaintiffs and defendants held a part, but this title was invalid as against the third title.

The third title called the Blair tax title, was created by a sale and conveyance in 1806, to John Blair for unpaid taxes due to the Commonwealth. Both the plaintiffs and defen-

dants claimed under this title, and did not dispute its validity or due proof.

The defendants showed title to an undivided eighth part of this Blair tax title, through H. N. Burroughs, purchase thereof June 21st, 1862, under due proceedings, from the guardian of the estate of one of John Blair's heirs, and also to one half of the remaining undivided seven-eighths parts thereof, the other half of which, namely, seven-sixteenths parts of the whole, the plaintiffs claim in the present ejectment, which claim the defendants dispute.

These seven-eighths parts of that title passed as follows: one-eighth by deed dated October 4th, 1856, from J. Blair Walker; one-fourth by deed dated November 25th, 1856, from E. B. Walker and M. B. Hetherington ; one-fourth by deed dated October 6th, 1857, from J. C. Blair; one-fourth by deed dated October 7th, 1857, from Thomas J. Blair, all heirs of John Blair, to Theodore G. Pomeroy, in fee.

October 9th, 1856, Theodore G. Pomeroy and John C. Heylman executed the following agreement, which was recorded September 23d, 1856, namely :

" Articles of agreement made and entered into between T. G. Pomeroy, of Cresson, in the county of Cambria and state of Pennsylvania, of the one part, and John. C. Heylman, of the borough of Harrisburg, county of Dauphin, and state aforesaid, of the other part, witnesseth: That the said T. G. Pomeroy and J. C. Helyman hereby mutually covenant and agree that they will purchase from the heirs of Thomas Proctor, of Revolutionary memory, and others, if necessary, the title to two tracts of land surveyed in the names of John Gray and William McDougal, located in the counties of Cambria and Blair ; also any other tracts that may belong to the said heirs of Thomas Proctor, deceased, located within the state of Pennsylvania.

" It is hereby understood that all title relative to the said tracts mentioned shall belong equally to the said T. G. Pomeroy and the said John C. Heylman, and that all the moneys paid for the same by either party, and the expenses incurred by obtaining the title to the same shall be equally borne by the said T. G. Pomeroy and John C. Heylman, and in the event of one party advancing more money than the other party for the purpose of securing the title to said lands, the party advancing the said money shall firmly hold the party advancing his proportion for one-half of the money so advanced, and in the event of the title thus purchased not proving good, then each of the parties shall bear the loss consequent upon the purchase equally, and in the event of the title proving good, then each party is to share alike in the profits.

[Orne *v.* Kittanning Coal Co.]

"It is mutually agreed between the said T. G. Pomeroy and J. C. Heylman, that the said T. G. Pomeroy shall hold the entire title obtained to the said premises, one-half in trust for the use of the said John C. Heylman. And the said T. G. Pomeroy hereby agrees to convey the said one-half in trust to such party as he the said J. C. Heylman may elect, providing the purchase money for the said J. C. Heylman's interest is paid to the said T. G. Pomeroy, his heirs or assigns, at the cost of the same, with interest from the date of payment, before the execution of said deed.

"The foregoing article of agreement shall be binding upon our heirs and assigns.

"Witness our hands and seals this ninth day of October, A. D. 1856.

"T. G. POMEROY.          [SEAL.]

JNO. C. HEYLMAN.          [SEAL.]

"Present :

"W. H. JONES."

Heylman obtained the said conveyances of seven-eighths of the Blair tax title to Pomeroy, receiving the purchase money therefor from him, and giving him for his, Heylman's share thereof and other indebtedness his, Heylman's, and his father-in-law's three judgment notes, together amounting to $2,898.64, all dated September 22d, 1858, which were entered up in the Court of Common Pleas of Dauphin county, November 24th, 1858; upon the first whereof Pomeroy made the money by execution, and the other two were assigned by him to W. N. Wiley, September 23d, 1858, and the money due thereon made partly by payment and partly by execution, in Dauphin county, and the residue, upon a transcript of the last of said judgments filed in the Court of Common Pleas of Blair county, by execution and sheriff's sale and conveyance in 1862, of all Heylman's interest in said tracts; and that title of the sheriff's vendee duly passed to the plaintiffs.

H. N. Burroughs, through whom the defendants claim, while holding Pomeroy's right, title, and interest, being an undivided half part of said tracts, on February 26th, 1863, before distribution of the proceeds of said sheriff's sale of Heylman's interest in said tracts, purchased and by writing filed, had assigned to him, Burroughs, from Wiley, the said judgment, whereon said sale was had, and also the proceeds thereof in the sheriff's hands distributable to the holder of that judgment in satisfaction of it, and subsequently received those proceeds.

Pomeroy, with John F. Cottrell, had on July 3d, 1854, obtained a conveyance of one fourth of the Jackson title, and

September 3d, 1855, they conveyed their right, title, and interest in said tracts with special warranty, only, to the Allegheny Railroad and Coal Company, which company, September 12th, 1855, executed to them its mortgage thereof to secure its notes to Pomeroy and Cottrell for the purchase money, said mortgage being also made to other owners of that Jackson title to secure its notes to them for purchase money thereof.

That company, finding its title worthless, did not pay said notes, and three suits were brought in Philadelphia county upon said notes by some of said holders against the company to December Term, 1857, and upon a testatum execution in one of said suits to Blair county the title of the company to said tracts was sold and conveyed by the sheriff to James McCormick, Jr., November 26th, 1860.

On October 31st, 1860, Pomeroy executed an agreement with the other holders of said notes, reciting the pendency of the said testatum execution, and agreeing that they would unite in the purchase thereunder and hold the tracts in such proportion that Pomeroy would be the owner of one undivided half, and the other parties of the other undivided half thereof, Pomeroy covenanting therein to release and surrender to the other parties, or to the trustee to buy for them, all his, Pomeroy's, right, title, and interest in said lands, in excess of one half thereof.  Said McCormick purchased for them, and, June 13th, 1862, conveyed his title to Burroughs in fee, and he, September 9th, 1863, to the defendants.

The defendants claimed, and the court, in its general charge and answers to the plaintiffs' points which were excepted to, affirmed the defendants' contention, which is the whole subject of errors assigned, that Heylman's fraudulent acts, found by the jury and now to be stated, under the foregoing circumstances, deprived him and the plaintiffs' vendees of his title, of their right to maintain this ejectment for their seven-sixteenths parts of these tracts.

Before Heylman and Pomeroy's said agreement of October, 1856, Heylman had defrauded Pomeroy, as follows:  On January 1st, 1856, Heylman, under a letter of attorney to him, dated December 20th, 1855, purporting to be executed by an heir of said Proctor, named Z. P. Lea, and his wife, but whose signatures thereto were not genuine, made a conveyance of the interest of said Lea and wife in said tracts to Pomeroy in fee. Heylman negotiated and, February 14th, 1856, obtained a conveyance from John Miller and his wife, another heir of said Proctor, paying her therefor $300, and also negotiated and, September 17th, 1856, obtained a conveyance from another heir of said Proctor named Jesse H. Batchelor and his wife, paying him therefor $200. and also negotiated and, September

18th, 1856, obtained a conveyance from Ann Myers, another heir of said Proctor, paying her therefor $200, amounting in all to $750, and said titles Heylman caused to be conveyed to Pomeroy in fee.

·The said judgment notes given upon the accounts settled between Heylman and Pomeroy, September 23d, 1858, covered not only Heylman's half of what was furnished by Pomeroy and paid for the Blair tax titles and Proctor titles obtained subsequent to, and under, their agreement of October, 1856, but also $1,051.67 as Heylman's half of what Pomeroy had previously furnished to pay Z. P. Lea with interest, and an excess over one-half of the amounts previously really paid Miller, Batchelor and Myers as Heylman's share, indicating that Heylman had before the agreement of October, 1856, obtained from Pomeroy money as for purchase money for parts of the Proctor title previously conveyed to Pomeroy in fee, which Heylman, however, did not pay therefor.  And of course, he was indebted to Pomeroy for this amount, thus theretofore fraudulently obtained from him by Heylman.

There was no evidence of any written agreement between them before October, 1856, or of any oral agreement except the account settled on September 23d, 1858, and Heylman's negotiating the said purchases made prior to October, 1856.    These indicated some understanding between them that Heylman was to pay Pomeroy one half of the amounts paid on those purchases, but it did not appear whether under separate oral agreements made upon each alleged purchase, or some general agreement like that of October, 1856, nor did it appear what interest Heylman should have in the purchases, except the presumption of an equal interest arising from paying half the purchase money.

Pomeroy died in 1864.   Pomeroy's vendees, every year between 1860 and 1863, mined and disposed of a large quantity of coal from the said tracts, largely more than sufficient to pay Heylman's debt to Pomeroy for said frauds.

The plaintiff presented *inter alia* the following points:—

6. But even if you should find that Heylman was a party to or cognizant of those alleged forgeries, and did not pay over the moneys he obtained from Pomeroy on account of these titles to other parties, though acts highly censurable and punishable, yet they related only to the titles of those Proctor heirs, and the conveyances thereof being consummated to Pomeroy before his agreement of October, 1856, the agreement giving Heylman any interest therein, whereto these acts of Heylman had relation, must have existed at the time.of those conveyances, and the defendants claim it was the same agreement in terms in parol as that which they subsequently executed in

[Orne v. Kittanning Coal Co.]

writing in October, 1856, but that written agreement of October, 1856, however similar in terms to their previous oral understanding, which was in law of no obligation, as it related to realty, was a subsequent, distinct agreement, so that Heylman's said alleged misconduct was in relation to a different subject matter from the Blair tax titles, and under another agreement than that of October, 1856, under which the Blair tax titles were acquired, which the taint of that alleged misconduct cannot affect, and the defence to the plaintiffs' claim upon that ground fails. Refused—(Second assignment of error).

7. That the bringing of the moneys obtained by Heylman from Pomeroy on account of these Proctor titles, into the subsequent account made between them of their transactions as to the Blair tax titles under the agreement of October, 1856, to fix the whole amount of Heylman's then indebtedness to Pomeroy on all accounts for settlement, does not affect Heylman's equity to the Blair tax titles, obtained under his agreement of October, 1856, with the taint of his said alleged misconduct, and the defence to the plaintiffs' claim upon that ground fails. Refused. (Third assignment of error.)

In the general charge the court instructed the jury *inter alia* as follows:

The amount which the defendants allege that Heylman defrauded Mr. Pomeroy of is, I believe, $2,850; $2,000 on the Lea purchase, $250 on the Batchelor purchase, $200 on the Miller purchase, and $400 on the Myers purchase, independent of the interest. It is alleged that he represented that these titles cost him $2,850 more than he actually expended, and that the whole amount of the notes that he gave for his half of the supposed purchase money did not exceed the amount of money he had taken. If this is true, then, as a matter of course, he has not paid anything for his title, and would not have any interest in it, nor be entitled to the conveyance of any portion of it, if he were a suitor here. This case, in our view of the law on this point, stands the same as if Heylman were living and in court now asking a conveyance from Pomeroy for the half of this land under the agreement. If the conduct of Heylman was such that a Court of Equity would not permit him to have the half of the lands because of frauds on Pomeroy, then we instruct you that the present plaintiffs, claiming under Heylman by the sheriff's sale of his interest, stand in no better relation to the parties defending here than he would have done; and [if you find that his conduct in reference to these purchases was fraudulent towards Pomeroy as to the amounts he alleged that these titles cost; if he made this deed as attorney in fact of Lea, knowing that the power of

4 AMERMAN —12

[Orne *v.* Kittanning Coal Co.]

attorney under which he pretended to act was a forgery; if he didn't have a power of attorney; or if in any respect he acted in bad faith and fraudulently towards his partner, Pomeroy, then he could not have a Court of Equity decree him a conveyance of the half of these lands; and in that event your verdict should be for the defendants generally.] But if the defendants have failed to satisfy you that the conduct of Heylman was fraudulent in these respects, then the plaintiffs, having shown that their purchase money was paid in the collection of these notes, would be entitled to recover seven-sixteenths of the land described in the writ, subject to the opinion of the court on the several questions of law which have been submitted by the counsel on the one side or the other. As you find this one fact, so your verdict will be, either for the defendant or for the plaintiffs for the seven-sixteenths of the land described in the writ.

Verdict for the defendants and judgment thereon, whereupon the plaintiff took this writ assigning for error, *inter alia*, the answer of the court to these points as shown above and that portion of the charge included within brackets.

*George L. Crawford* and *Benjamin Harris Brewster*, (*H. M. Baldridge* with them) for plaintiffs in error.—The fraud here was not in the making, but in the performance only of a previous agreement in respect to other parts of an invalid title to the same lands, and the fraud to defeat the specific performance of a contract must reach the bond of the contract itself.

Fraud is cognizable and remediable at law as well as in equity, and the morals and justice enforced in each jurisdiction are in this respect alike.

Fraud, to vitiate a contract, must be *dans locum contractui*, or *dans causam contractui*, that is, such a fraud as occasioned the contract, not collateral to it, as in a security accompanying a debt: Smith *v.* Kay, 7 H. L. C., 750, 775; Fry on Specific Performance, § 434; Nat. Ex. Co. *v.* Drew, 2 Mac Queen, 103; Wilson *v.* Berg, 7 Norris, 167; Abbey *v.* Dewey, 1 Casey, 416.

II. Heylman performed his part of the agreement and consideration by obtaining the Blair tax titles, as well as the other titles, and causing them to be conveyed to Pomeroy as legal holder, and also paying his (Heylman's) half of the whole purchase money, not only of the valid titles and all other titles obtained subsequent to and under the agreement, by specific appropriation in the account settled between them in 1858, but also his half of the purchase money for all the other titles obtained before the agreement, including his half of the moneys before fraudulently obtained, but not used, as purchase money, and the remaining half thereof was more than repaid by Heyl-

man's half of the proceeds of the lands soon after received by Pomeroy's vendees.

And the plaintiffs paid their money on the faith of Heylman's recorded equitable title in the express declaration of trust in the agreement, without notice of any fraud or counter-equity.

Before the party who alleges the fraud can ask for relief, he must put the other party in *statu quo* so far as it can be done : Pearsoll *v.* Chapin, 8 Wr., 9 ; Byard *v.* Holmes, 4 Vt., 125.

An innocent purchaser of land without notice of hurt or fraud, is protected in equity, and chancery never lends its aid to enforce a claim for the land against him : Hoffman *v.* Strohecker, 9 Watts, 189 ; Stewart *v.* Reed, 10 Norris, 287 ; Price *v.* Junkin, 4 Watts, 87.

Fraud is personal and individual in its nature, and only the party injured can claim advantage of it.

An assignee of a contract cannot insist upon fraud used in making of the contract on the party under whom he claims : Carroll and others *v.* Potter, Walker's Chancery Repts., Michigan, 355.

A claimant cannot raise a question of fraud in a conveyance to which he is a stranger. The party injured by a fraud alone can complain of it : Crane *v.* Reeder, 25 Michigan Repts., 304.

*Samuel S. Blair* for defendant in error.

Mr. Justice CLARK delivered the opinion of the court, October 4th, 1886.

By the terms of the contract of the 9th of October, 1856, it was agreed between T. G. Pomeroy and J. C. Heylman, that they would purchase, together, the Proctor title and such other titles as might be necessary to secure to them the lands in controversy ; that the legal title to said lands should be vested in Pomeroy, one-half for his own use and the other half for the use of Heylman ; Pomeroy to convey the one-half, held in trust, to such person as Heylman might designate, " providing the purchase money for said J. C. Heylman's interest is paid to the said T. G. Pomeroy, his heirs and assigns, at the cost of the same, with interest from the date of payment, before the execution of said deed."

The plaintiffs claim title to an undivided part, as purchasers of the interest of Heylman under the contract; the defendants claim as the holders of the title of Pomeroy.

The Kittanning Coal Company are admittedly invested, not only with the absolute title to Pomeroy's half interest in the lands, purchased under the agreement, but with the legal title

of Heylman's half, according to the terms and conditions of the contract. It is plain then, that the Kittanning Coal Company, holding the full title of Pomeroy, are privies in estate with him, and in this controversy stand in his stead. It is not pretended, much less shown, that Heylman, or any of those claiming under him, were at any time in the possession of the premises ; the Allegheny Railroad Company, and their successors in title, the Kittanning Coal Company, from the date of, and indeed long prior to, the inception of Heylman's equity, have admittedly held the exclusive actual occupancy of all the lands covered by this dispute.

This ejectment is one, therefore, by the holder of a merely equitable title, out of possession, against the holder of the legal title, in the admitted peaceful, actual and adverse occupancy of the land. In such a case, it is clear that an ejectment will not lie to turn the trustee out of the possession, until one-half of the purchase money advanced and one-half the expenses incurred by Pomeroy have been paid, or tendered in compliance with the contract.

The general rule is that in an ejectment founded on an equity only, the plaintiff, to be entitled to recover, must not only tender the money before suit brought, but to show his readiness to perform, he must also have it in court ready to be paid in the event of a verdict in his favor: Minster *v.* Morrison, 2 Yeates, 346 ; Gore *v.* Kinney, 10 Watts, 139 ; Eberly *v.* Lehman, 4 Out., 546. If, however, the equitable owner by the terms of his contract is entitled to, or by consent is once fairly put into, the possession under his title, and by force, fraud, or other illegal means is ousted therefrom, the rule as stated does not apply: Harris *v.* Bell, 10 S. & R., 39; Gregg *v.* Patterson, 9 Watts, 208 ; D'Arras *v.* Keyser, 2 Casey, 252; Chase *v.* Irwin, 6 Norris, 288.

In the very recent case of Bell *v.* Clark, 17 W. N. C., 44, the rule is thus stated:—" Where the possession of the vendor is lawful, his vendee cannot maintain ejectment against him, without proof of a previous tender of the purchase money, and he must maintain that tender by producing the money in court." These cases have been followed by the still more recent case of McGrew *v.* Foster, in the eastern district, not yet reported.

It is contended, however, on part of the plaintiffs, that the purchase money has been fully paid, in accordance with the contract ; that three certain notes, which Heylman gave to Pomeroy, on the 22d of September, 1858 ; one for $997.58, at two months ; one for $950.53, at four months, and one for $950.53, at six months, were for the purchase money and expenses of this joint purchase, and for reimbursement of Pomeroy for the money advanced on the contract ; that all of these

notes were, before the institution of this suit, fully paid, and that the contract was on Heylman's part thus fully complied with, by means whereof he was entitled to a conveyance, and, therefore, to the possession as incident to his title.

On the other hand, however, it is alleged, and the jury has so found, that Heylman in the settlement, which resulted in the execution and delivery of these notes, perpetrated upon Pomeroy a most gross and glaring fraud; that by falsehood and forgery he deceived Pomeroy as to the amount he actually applied to the purchase of these titles, and that in consequence the notes did not, in fact, represent the sums which Heylman owed Pomeroy, under his contract.

In that settlement, Heylman received credit for $2,000, which he alleged he had paid for the interest of one Z. P. Lea; this money Pomeroy had advanced to Heylman upon the faith of a conveyance to him by Heylman, under authority of a letter of attorney from Lea, which Heylman himself had forged. He also received credit for $850 more than he paid of Pomeroy's money, for the interests of Miller, Myers, and Batchelor; having falsely and fraudulently altered the true consideration mentioned in the respective deeds, to accomplish this purpose. These fraudulent transactions of Heylman are not denied; they are frankly admitted, and in addition, as we have already said, they have been found by the jury. The several sums of money of which Pomeroy was thus defrauded, with the interest thereon, actually exceed the amount covered by the obligations, taken at the settlement of the 22d of September, 1878; and although the obligations were accepted as securing the full amount of Heylman's half of the purchase money, in no proper sense can it be said that the purchase money has been paid; indeed, the entire amount of it remains unpaid.

It is of little consequence, we think, that some of the transactions complained of occurred prior to the agreement of the 9th of October, 1856; for it is plain, from the subsequent settlement, either that the agreement was made upon the faith of, and embracing, these previous purchases; or, they were afterwards brought into it, and accepted by Pomeroy as part performance thereof; and if it be assumed that the fraud of Heylman was not in the making of the contract itself, but in the performance of it only, the result is the same in this case, as without a full and fair performance on part of the plaintiffs or a tender thereof, there can be no recovery.

The case in either event is to be determined as if the parties to the suit were the original parties to the contract; the Kittanning Coal Company stand in Pomeroy's place, as the holder of the legal title in possession, and the plaintiffs by set-

[Orne *v.* Kittanning Coal Co.]

ting up the equity of Heylman cannot deprive them of that possession, except upon showing that they are in no default, under their contract. It is one of the elementary and fundamental principles of equity, that " he who seeks equity must do equity," and another, that " he who cometh into equity, must come with clean hands ; " the doors are shut against one, who, in his prior conduct in the very subject matter at issue, has violated good conscience, good faith or fair dealing.

Therefore, if the fraud of Heylman may be considered as having entered into the contract itself, at its execution, a court of equity will not afford a remedy for its enforcement in his favor ; if it affected only the performance, as the plaintiffs assume, the defendants cannot be compelled to yield the possession until the purchase money has been paid.

Fraud, it is true, is not a marketable commodity ; the right to avoid or to invalidate a contract, upon the ground of fraud, unless the fraud be of such a character as to render it absolutely void, is in some sense personal ; fraud will not form the substance of an assignment, so as to constitute a cause of action in the hands of the assignee. It may pass, however, as incident to a proper subject of assignment. It can only be pleaded by him, whose option it is to affirm, or disaffirm the contract, or by his representatives, or for his interest, or in his right ; as here, by his privies in estate : Waterman on Contracts, Story's Eq. Jur., 1041, note.

Nor can we make any distinction, in principle, in this respect, between the ordinary case, arising upon articles between vendor and vendee, and this case, which is said to arise out of an agreement containing an express superadded declaration of trust. When an agreement for sale of land is fully executed in writing, the vendor thereby at once assumes the character of a trustee, and holds the legal title as trustee for the vendee, under the terms and conditions of the contract. The trust which in equity is implied, is precisely of the same character as if it had been fully expressed on the face of the paper.

Upon a careful examination of the whole case we are of opinion the judgment must be affirmed.

Judgment affirmed.